(No. 82917.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. ROBERT SANDERS, Appellee.

*Opinion filed June 18, 1998.*

HARRISON, J., concurring in part and dissenting in part.
BILANDIC, J., dissenting.

James E. Ryan, Attorney General, of Springfield,

and Michael J. Waller, State's Attorney, of Waukegan (Barbara A. Preiner, Solicitor General, and William L. Browers and Bridget L. Field, Assistant Attorneys General, of Chicago, of counsel, and Karen Kavanagh, law student), for the People.

Richard D. Grossman, of Chicago, and David Winer, of Waukegan, for appellee.

JUSTICE McMORROW delivered the opinion of the court:

The State charged defendant Robert Sanders by information with violation of section 2(c) of the Illinois Hunter Interference Prohibition Act (720 ILCS 125/2(c) (West 1996)). Pursuant to defendant's motion to dismiss, the circuit court of Lake County entered an order on February 20, 1997, dismissing the criminal charge against defendant. The court found section 2(c) impermissibly vague and overbroad, in violation of the United States Constitution. U.S. Const., amends. I, V. Because the statute was declared unconstitutional, the State's appeal from that ruling lies directly to this court. 134 Ill. 2d R. 603. We affirm.

## BACKGROUND

Section 2 of the Illinois Hunter Interference Prohibition Act (Act) states:

"Any person who performs any of the following is guilty of a Class B misdemeanor:

(a) Interferes with the lawful taking of a wild animal by another with intent to prevent the taking.

(b) Disturbs or engages in an activity that will tend to disturb wild animals, with intent to prevent their lawful taking.

(c) [D]isturbs another person who is engaged in the lawful taking of a wild animal or who is engaged in the process of taking, with intent to dissuade or otherwise prevent the taking.

(d) [E]nters or remains upon public lands, or upon private lands without permission of the owner or his agent or a lessee, with intent to violate this Section." 720 ILCS 125/2 (West 1996).

The Act defines "wild animal" as "any wild creature the taking of which is authorized by the fish and game laws of the State." 720 ILCS 125/1(a) (West 1996). Under the Act, "taking" means "the capture or killing of a wild animal and includes travel, camping, and other acts preparatory to taking which occur on lands or waters upon which the affected person has the right or privilege to take such wild animal." 720 ILCS 125/1(b) (West 1996). No other terms are defined by the Act.

The State filed an information on November 19, 1996, charging defendant, Robert Sanders, with the offense of "Interference with lawful taking of wild animal." 720 ILCS 125/2 (West 1996). The State alleged that on February 16, 1996, defendant "disturbed Elizabeth B. Surge" with the intent to dissuade her, by yelling at her and taking her photograph as she attempted to shoot a deer.

In documents filed with the circuit court, defendant initially contended that the confrontation with Surge occurred "on a public street in a residential neighborhood relating to the capture of deer." The State's response to defendant's motion to dismiss stated that defendant approached Surge at a "deer relocation sight [sic] in Highland Park." On appeal, defendant apparently agrees with the State's characterization of the incident, since the defendant's appellee's brief concedes that "[d]efendant took a picture of, and spoke to a person working at a deer relocation center."

Defendant moved to dismiss the information. Defendant claimed that subsection (c) of section 2 is overbroad in violation of the first amendment to the United States Constitution and unconstitutionally vague in violation of the "Due Process Clause."

On February 20, 1997, the circuit court of Lake County entered a written finding granting defendant's motion to dismiss. The court ruled that prosecution of subsection (c) of section 2 "require[s] allegations and proof of three elements:

> 1. disturbing another person ***;
> 2. the other person must be actively engaged or in the process of taking a wild animal; and
> 3. an intent to dissuade or otherwise prevent the taking."

The circuit court examined other Illinois statutes, such as those proscribing disorderly conduct (720 ILCS 5/26—1 (West 1996)), mob action (720 ILCS 5/25—1 (West 1996)), intimidation (720 ILCS 5/12—6 (West 1996)), and telephone harassment (720 ILCS 135/1—1 (West 1996)), "from the p[er]spective of similar language, constitutional challenges, and rulings based on those challenges." Lastly, the court found persuasive case law cited by defendant, as it pertained to "vagueness, overbrea[d]th, free speech and due process."

Based on the foregoing analysis, the circuit court dismissed the information, and ruled that section 2 of the Act "is vague, overbroad, and violative of due process with respect to the protection of freedom of speech," "to the extent that the term [']dissuades['] is used."

Pursuant to Illinois Supreme Court Rule 603, the State appealed the February 20, 1997, order to this court. 134 Ill. 2d R. 603.

## STANDARD OF REVIEW

We presume all statutes are constitutionally valid. *People v. Warren*, 173 Ill. 2d 348, 355 (1996); *People v. Jeffries*, 164 Ill. 2d 104, 111 (1995). In construing a statute, this court must affirm the enactment's validity and constitutionality if reasonably possible. *People v. Kimbrough*, 163 Ill. 2d 231, 237 (1994). The party challenging a statute's constitutionality bears the burden of

clearly establishing its constitutional infirmity. *Fink v. Ryan*, 174 Ill. 2d 302, 308 (1996).

## ANALYSIS

Before this court, the State contends the circuit court erroneously found section 2(c) of the Act unconstitutional. The State argues the statute is neither overbroad nor vague.

While defendant agrees with the result reached by the lower court, he suggests on appeal that we affirm by following a different analysis than that chosen by the circuit court. Defendant accurately argues that the term "intent to dissuade" in section 2(c) must be subjected to a separate, "content-neutrality" inquiry before this court confronts the basis employed by the circuit court for its ruling, *i.e.*, whether the statute is unconstitutionally overbroad or vague. This is so because, logically, if section 2(c) is impermissibly content-based, then we need not reach the defendant's overbreadth or vagueness challenge with respect to that section. See, *e.g.*, *Consolidated Edison Co. of New York, Inc. v. Public Service Comm'n*, 447 U.S. 530, 536, 65 L. Ed. 2d 319, 327, 100 S. Ct. 2326, 2332-33 (1980) (a valid time, place and manner restriction may not be grounded on the content or subject matter of speech).

### A. Content-Neutrality

The government may not prohibit the expression of thoughts simply because society finds the expressed idea offensive or disagreeable. *Texas v. Johnson*, 491 U.S. 397, 414, 105 L. Ed. 2d 342, 360, 109 S. Ct. 2533, 2545 (1989). Under the content-neutrality principle, "the government may not proscribe any expression because of its content, and an otherwise valid regulation violates the first amendment if it differentiates between types of expression based on content." (Emphasis omitted.) R. Sedler, *The First Amendment in Litigation: The "Law of*

*the First Amendment,"* 48 Wash. & Lee L. Rev. 457, 466 (1991). Thus, any enactment intended to silence an opinion is presumptively invalid (*R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 120 L. Ed. 2d 305, 317, 112 S. Ct. 2538, 2542 (1992); *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 46-47, 89 L. Ed. 2d 29, 37, 106 S. Ct. 925, 928 (1985)) and may only survive if justified by a compelling state interest and if narrowly tailored to achieve that interest (*City of Renton,* 475 U.S. at 47, 89 L. Ed. 2d at 37, 106 S. Ct. at 928).

The government's purpose in enacting a prohibition on expression controls a "content-neutrality" inquiry. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 105 L. Ed. 2d 661, 675, 109 S. Ct. 2746, 2754 (1989). "Government regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" (Emphasis in original.) *Ward v. Rock Against Racism,* 491 U.S. at 791, 105 L. Ed. 2d at 675, 109 S. Ct. at 2754, quoting *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 293, 82 L. Ed. 2d 221, 227, 104 S. Ct. 3065, 3069 (1984). A restriction that applies impartially to all viewpoints is deemed content-neutral. Comment, *The Right to Arm Bears: Activists' Protests Against Hunting,* 45 U. Miami L. Rev. 1109, 1126 (1991).

Defendant maintains that inclusion of the phrase "intent to dissuade" in section 2(c) renders the statute content-based, because the word "dissuade" means "advise" or "exhort." Defendant reasons further that, if the state proscribes conduct performed with an intent to dissuade, then the state commits the constitutionally impermissible act of penalizing a citizen for the content of his expression. By outlawing a viewpoint which is expressed with an intent to dissuade, defendant continues, the state implicitly "shut[s]-off one half of the debate" about hunting, and allows those who disturb a

hunter without an intent to dissuade to avoid criminal liability.

In *State v. Miner*, 556 N.W.2d 578 (Minn. App. 1996), the Minnesota Court of Appeals construed a "hunter harassment" statute which stated in part:

"A person who has the intent to prevent, disrupt, or dissuade the taking of a wild animal or enjoyment of the out-of-doors may not disturb or interfere with another person who is lawfully taking a wild animal or preparing to take a wild animal." *Miner*, 556 N.W.2d at 581, citing Minn. Stat. § 97A.037 (1994).

The *Miner* court held that, to the extent the statute only applied to persons whose intent was to "dissuade the taking of a wild animal or enjoyment of the out-of-doors," the statute was impermissibly content-based. *Miner*, 556 N.W.2d at 583; Minn. Stat. § 97A.037 (1994). "Dissuade," the court explained, carries a connotation of using argument, reasoning, entreaty, admonition, advice or appeal to convey a message. *Miner*, 556 N.W.2d at 582. The statute therefore discriminated between opposing points of view by attempting to silence persons intending to convey a particular message. *Miner*, 556 N.W.2d at 582-83; see also *Opinion of the Justices*, 128 N.H. 46, 509 A.2d 749 (1986).

Further, the *Miner* court ruled that the State of Minnesota could not articulate a constitutionally sound argument in favor of the content-based law. Assuming *arguendo* that the state possessed a compelling interest in protecting the right of individuals to lawfully take wild animals, the state failed to explain why prohibiting disturbing speech only if the speaker intends to dissuade the taking of an animal was necessary to serve and protect that interest. *Miner*, 556 N.W.2d at 583; *Dorman v. Satti*, 862 F.2d 432, 437 (2d Cir. 1988) (court stated that "[t]here is no showing that protecting hunters from harassment constitutes a compelling state interest").

In the case at bar, the State cites to *State v. Lilburn*, 265 Mont. 258, 875 P.2d 1036 (1994), and *Woodstock Hunt Club v. Hindi*, 291 Ill. App. 3d 1051 (1997), both of which construed the phrase "intent to dissuade" in hunter harassment statutes as content-neutral. In each case, the reviewing court read the phrase "intent to dissuade" as a nonessential element of a larger statutory scheme, designed to punish any interference with a taking, regardless of whether the offender intended to convey a particular message. *Lilburn*, 265 Mont. at 267, 875 P.2d at 1042; *Woodstock Hunt Club*, 291 Ill. App. 3d at 1054. Hence, the Montana Supreme Court and Illinois Appellate Court held that, while the statutes potentially outlawed verbal utterances by someone intending to prevent a taking of wildlife, they did not criminalize verbal utterances on the basis of content. *Lilburn*, 265 Mont. at 266, 875 P.2d at 1041-42; *Woodstock Hunt Club*, 291 Ill. App. 3d at 1054.

The *Lilburn* court decided that opponents of the statute placed erroneous emphasis on the word "dissuade":

> "Reading the statute as a whole, it is clear that the conduct proscribed is the 'disturbance' of a hunter engaged in a lawful activity, when it is done with the intent to either dissuade the hunter or to prevent the taking of an animal. The fact that the speech or actions may disturb a hunter is not dependent on the content of what is expressed, or whether it is prompted by an anti-hunting sentiment. A person could blurt out anything at the moment a hunter is trying to shoot, and this could 'disturb' the hunter by distracting him or her, or by scaring the animal away. The content of what was said would be irrelevant." *Lilburn*, 265 Mont. at 268, 875 P.2d at 1042-43.

See also *Woodstock Hunt Club*, 291 Ill. App. 3d at 1054 (the Act does not single out any particular thought or opinion for prohibition, but "merely prohibits intentional interference with the lawful taking of wild animals").

We agree that proper interpretation of the term "dissuade" demands that we place the term in its full

context. *Woodstock Hunt Club*, 291 Ill. App. 3d at 1055; see also *People v. Frieberg*, 147 Ill. 2d 326, 348 (1992); *Oberman v. Byrne*, 112 Ill. App. 3d 155, 162 (1983). However, we cannot ignore the plain meaning of "intent to dissuade," as employed in section 2(c). *People v. Geever*, 122 Ill. 2d 313, 329-30 (1988). As explained in *Miner*, the word "dissuade" carries a specific meaning associated with argument and with promoting a particular point of view. *Miner*, 556 N.W.2d at 583. Subjecting to criminal liability expression which is made with an intent to dissuade, while failing to threaten punishment for expressions intended to encourage or persuade, constitutes an illegal legislative censure of opinion.

We note as well that, had the legislature intended to curb conduct without regard to any message conveyed by the conduct, it could have done so by limiting the criminal *scienter* in section 2(c) to the phrase "intent to prevent" and no more. Indeed, section 2(a) proscribes "interferences" with hunting when the interference is motivated by an intent to prevent. 720 ILCS 125/2(a) (West 1996). Thus, the inclusion of a separate subsection adding the words "intent to dissuade" substantiates our judgment that the legislature intentionally injected the concept of suasion into subsection (c). Section 2(c) is not content-neutral.

The prohibitions of section 2(c) do not serve a compelling state interest. While the Act furthers reasonable and legitimate state interests by permitting hunting within its borders (see *People v. Diekmann*, 285 Ill. 97, 100 (1918); *Parker v. People*, 111 Ill. 581, 588 (1884); *Magner v. People*, 97 Ill. 320, 333-34 (1881)), none of these considerations are of such magnitude as to constitute a compelling interest. Further, even if we did find that the state's concerns could be characterized as "compelling," the General Assembly's decision to protect that interest by targeting expression of an opinion, as op-

posed to intentional, disruptive behavior in general, is difficult to justify. *Miner*, 556 N.W.2d 583.

Nevertheless, inclusion of the term "intent to dissuade" in section 2(c) is not fatal to the validity of the entire Act. Mindful of our obligation to uphold legislative enactments whenever reasonably possible (*Kimbrough*, 163 Ill. 2d at 237), we may excise the offending portion from the Act and preserve the remainder (see 5 ILCS 70/1.31 (West 1996)), provided the remainder is complete in and of itself, and is capable of being executed wholly independently of the severed portion (*Tully v. Edgar*, 171 Ill. 2d 297, 313 (1996); *People ex rel. Adamowski v. Wilson*, 20 Ill. 2d 568, 582 (1960)). To sever section 2(c) without negating the viability of the remaining sections of the Act, we should also conclude that, even in the absence of the excised provision, the General Assembly would still have adopted the Act. *Tully*, 171 Ill. 2d at 313; *Wilson*, 20 Ill. 2d at 582.

Section 2 readily survives the severability test. As originally drafted, section 2 purports to prohibit four distinct means of interrupting a "taking" of wildlife. Each subsection stands independently of the others, so that the removal of one (such as subsection (c)) undermines neither the completeness nor the executability of the remaining subsections. We believe the legislature would endorse section 2 without subsection (c). The plain purpose of the statute is to outlaw any intentional hindrance of the taking of wildlife. Section 2 accomplishes that aim, with and without inclusion of "intent to dissuade." In particular, section 2(a) proscribes "[i]nterfer[ing] with the lawful taking of a wild animal by another with intent to prevent the taking." 720 ILCS 125/2(a) (West 1996). Section 2(a) is virtually identical to section 2(c), except for the inclusion of the "dissuade" aspect in the latter. By removing subsection (c), this court can neutralize a constitutional infirmity without

altering any of the remaining prohibitions in the Act. See *Miner*, 556 N.W.2d at 583 (court found that "intent to dissuade" is not so inseparably connected to remainder of statute that Minnesota legislature would not have passed the statute without it).

## B. Vagueness and Overbreadth

Because we have excised subsection (c) from section 2, we need not determine if the trial court committed reversible error when it held that the phrase "intent to dissuade" in subsection (c) is unconstitutionally vague · and overbroad. *Consolidated Edison Co. of New York, Inc. v. Public Service Comm'n*, 447 U.S. at 536, 65 L. Ed.2d at 327, 100 S. Ct. at 2332-33.

## CONCLUSION

We find section 2(c) of the Illinois Hunter Interference Prohibition Act (720 ILCS 125/2(c) (West 1996)) a content-based regulation not justified by a compelling state interest. Thus, we affirm the order of the circuit court finding section 2(c) unconstitutional. We also affirm the circuit court's order dismissing the criminal information filed against defendant.

*Affirmed.*

JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that section 2(c) of the Illinois Hunter Interference Prohibition Act (720 ILCS 125/2(c) (West 1996)) is facially invalid under the first amendment to the United States Constitution (U.S. Const., amend. I). I write separately because I have come to that conclusion for somewhat different reasons from those advanced by the majority. In addition, I believe the majority is incorrect in upholding the remainder of the statute. In my view, the entire statute is constitutionally infirm and should be invalidated.

Hunter harassment statutes, such as Illinois' Hunter Interference Prohibition Act, proliferated during the years between 1981 and 1996. Through efforts of the Sportsman's Caucus and the Wildlife Legislative Fund of America, a prohunting lobby based in Washington, D.C., every state in the nation has enacted some version of the law. K. Hessler, *Where Do We Draw the Line Between Harassment and Free Speech?: An Analysis of Hunter Harassment Law*, 3 Animal L. 129, 161 n.21 (1997). Most of the state statutes are based on model legislation drafted by the Wildlife Legislative Fund. Comment, *The Right to Arm Bears: Activists' Protests Against Hunting*, 45 U. Miami L. Rev. 1109, 1111 n.14 (1991).

The hunter harassment laws were enacted in response to a growth in antihunting protests by activists who regard hunting as cruel to animals, bad for the ecosystem, and morally wrong. 45 U. Miami L. Rev. at 1114-17. Historically, the protests have taken a variety of forms. These include walking along with hunters in the field and speaking to them about the violence and cruelty of hunting (see *Dorman v. Satti*, 862 F.2d 432, 434 (2d Cir. 1988)); standing in the hunters' way and engaging in other conduct, such as screaming and waving, that causes them to miss opportunities to shoot their prey (see *State v. Casey*, 125 Idaho 856, 857, 876 P.2d 138, 139 (1994)); forming a semicircle around a hunter and refusing to move from the line of fire after verbal entreaties to him to desist fail (see *State v. Ball*, 226 Conn. 265, 268, 627 A.2d 892, 895 (1993)); staging demonstrations, with signs and chanting, at the entrances of wildlife refuges and other hunting sites; spreading deer repellant (see B. Roegge, *Survival of the Fittest: Hunters or Activists? First Amendment Challenges to Hunter Harassment Laws*, 72 U. Det. Mercy L. Rev. 437, 439 (1995); 45 U. Miami L. Rev. at 1115); and

making loud noise with sirens or bullhorns in order to scare animals away from hunting areas (see *Woodstock Hunt Club v. Hindi*, 291 Ill. App. 3d 1051 (1997)).

The constitutionality of hunter harassment laws has been the subject of a substantial amount of litigation (see *State v. Miner*, 556 N.W.2d 578 (Minn. App. 1996); *State v. Casey*, 125 Idaho 856, 876 P.2d 138 (1994); *State v. Lilburn*, 265 Mont. 258, 875 P.2d 1036 (1994); *State v. Ball*, 226 Conn. 265, 627 A.2d 892 (1993); *State v. Bagley*, 164 Wis. 2d 255, 474 N.W.2d 761 (1991); *Dorman v. Satti*, 862 F.2d 432 (2d Cir. 1988); *Opinion of the Justices*, 128 N.H. 46, 509 A.2d 749 (1986)), and academic commentary (see K. Hessler, *Where Do We Draw the Line Between Harassment and Free Speech? An Analysis of Hunter Harassment Law*, 3 Animal L. 129 (1997); Comment, *State v. Lilburn and State v. Casey: Harassing Hunters with the First Amendment*, 32 Idaho L. Rev. 469 (1996); B. Roegge, *Survival of the Fittest: Hunters or Activists? First Amendment Challenges to Hunter Harassment Laws*, 72 U. Det. Mercy L. Rev. 437 (1995); J. Grafton, *Hunter Harassment Statutes: Do They Shoot Holes into the First Amendment?*, 96 W. Va. L. Rev. 191 (1993); Comment, *State v. Ball: Connecticut's Hunter Harassment Statute Under First Amendment Fire*, 13 Bridgeport L. Rev. 783 (1993); Comment, *Wyoming's Hunt Interference Law—Anarchy in the Woods: How Far Afield Does the Right of Free Speech Extend?*, 27 Land & Water L. Rev. 505 (1992); Comment, *The Right to Arm Bears: Activists' Protests Against Hunting*, 45 U. Miami L. Rev. 1109 (1991); S. Wozniak, *Validity & Construction of Statutes Prohibiting Harassment of Hunters, Fishermen, or Trappers*, 17 A.L.R.5th 837 (1994)).

Although the courts and commentators are not uniform in their analysis of the statutes, there is no serious dispute that these laws implicate rights protected by the first amendment to the United States Con-

stitution. In undertaking their constitutional analysis of the Illinois statute, my colleagues focus on section 2(c)'s use of the term "dissuade." This approach is apparently based on the dual assumptions that only section 2(c) embraces verbal communication, and that only verbal communication is subject to first amendment protection. Neither of these assumptions is valid.

Section 2(c) is not the only portion of the statute applicable to traditional speech. The remaining subsections apply to verbal conduct too. As the United States Court of Appeals for the Second Circuit recognized in *Dorman v. Satti,* 862 F.2d at 436-37:

"The Supreme Court has determined that statutory language prohibiting acts such as interference or harassment encompasses verbal as well as physical conduct. *Houston v. Hill,* 107 S. Ct. at 2511-12. Like the city ordinance struck down in *Hill,* the statute at issue here 'deals not with core criminal conduct, but with speech.' *Id.* at 2508. Consequently, the right of the government to prohibit such communicative expression is circumscribed by the first amendment. *See Perry Educ. Ass'n v. Perry Local Educs. Ass'n,* 460 U.S. 37, 45, 103 S. Ct. 948, 955, 74 L. Ed. 2d 794 (1983)."

In addition, first amendment protection is no longer limited to expressive speech. It extends to expressive conduct as well. See, *e.g., Texas v. Johnson,* 491 U.S. 397, 406, 105 L. Ed. 2d 342, 354, 109 S. Ct. 2533, 2540 (1989) (conduct can be sufficiently imbued with elements of communication to trigger first amendment protection). Accordingly, in analyzing the statute under the first amendment, we must be mindful of its relationship to what antihunting protestors do, not simply what they say.

In determining whether the Illinois version of the hunter harassment law passes muster under the first amendment, the threshold question we must resolve is whether it was aimed at what Professor Tribe has described as "communicative impact." L. Tribe, Ameri-

can Constitutional Law 580 (1978). In other words, is the statute content-based? The principal inquiry in making that determination is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 105 L. Ed. 2d 661, 675, 109 S. Ct. 2746, 2754 (1989). The purpose or justification of regulation will often be evident on its face, but even a facially neutral regulation may be content-based if its manifest purpose is to regulate speech because of the message it conveys. *Turner Broadcasting System v. Federal Communications Comm'n*, 512 U.S. 622, 645, 129 L. Ed. 2d 497, 520, 114 S. Ct. 2445, 2461 (1994). Regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content are subject to the most exacting scrutiny. *Turner*, 512 U.S. at 640-41, 129 L. Ed. 2d at 517, 114 S. Ct. at 2458.

Proponents of the hunter harassment laws have argued that the laws are actually content-neutral and should be evaluated according to a less stringent level of review. They contend that the statutes are simply intended to permit hunters to hunt, as the law allows, and that the statutes do not single out any particular point of view for suppression. Although a few courts have accepted this argument (see, *e.g.*, *Woodstock Hunt Club v. Hindi*, 291 Ill. App. 3d at 1054; *Lilburn*, 265 Mont. at 268, 875 P.2d at 1042-43), it is fundamentally unsound. In its origins and application, the statute "clearly is designed to protect hunters from conduct—whether verbal or otherwise—by those opposed to hunting." *Dorman*, 862 F.2d at 437.

That the statute is intended to target an antihunting point of view is manifest in section 2(c)'s use of the word dissuade, as the majority points out. It is also apparent, however, in the remaining portions of the law. Although the other sections contain no explicit content-

based limitation on the scope of prohibited conduct, the absence of such limitations will not save a statute from a first amendment challenge where it is nevertheless clear that the government's asserted interest is related to the suppression of free expression and concerned with the content of such expression. *United States v. Eichman*, 496 U.S. 310, 315, 110 L. Ed. 2d 287, 294, 110 S. Ct. 2404, 2407-08 (1990). Such is the case here.

Under every section of the statute, not just section 2(c), culpability is limited to those whose intent is to prevent the taking of wild animals. While those in favor of hunting may very well disturb wild animals or their fellow sportsmen, it is difficult to envision a scenario where their aim is to prevent an animal from being taken. As a practical matter no one who favors recreational hunting is going to engage in conduct prohibited by the law. Correspondingly, no one in favor of recreational hunting is going to be found guilty of violating the statute. The law affects one group and one group only: those who are morally or philosophically opposed to capturing or killing animals. The proof is in the case law. The State has not cited and I have not found a single instance in any jurisdiction in which a hunter harassment law was enforced against anyone other than an antihunting protestor.

That the statute is specifically designed to silence those who oppose recreational hunting is further demonstrated by the liability provisions of the law. Those found guilty of violating the statute are not simply subject to criminal penalties. They also face the extraordinary prospect of having to pay civil damages, including punitive damages, to hunters whose efforts were thwarted by the protestor's efforts. Among compensable items of recovery are expenditures for travel, guides and special equipment and supplies. 720 ILCS 125/4(b) (West 1996). These penalties serve no governmental

interest of any kind. Their only function is to protect the personal, pecuniary interests of sportsmen and quell dissent by those who oppose the hunt.[1]

Because the Illinois statute is content-based, it can withstand first amendment scrutiny only if it "is necessary to serve a compelling state interest and *** is narrowly drawn to achieve that end." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 74 L. Ed. 2d 794, 804, 103 S. Ct. 948, 955 (1983). Accord *Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105, 118, 116 L. Ed. 2d 476, 488, 112 S. Ct. 501, 509 (1991). The majority is right to hold that section 2(c) does not meet this exacting standard, but it should have reached the same conclusion with respect to the remainder of the statute.

Sportsmen may be entitled to engage in lawful hunting, but they do not have the right to do so free from annoyance, harassment and confrontation. Hunting and the treatment of animals present important moral,

---

[1]Although the majority had no occasion to address this feature of the statute, it is important to observe that it is flatly unconstitutional. States may not impose damage awards to punish those who engage in protests protected by the first amendment. See *National Ass'n for the Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 918, 933-34, 73 L. Ed. 2d 1215, 1240, 1249, 102 S. Ct. 3409, 3428, 3436 (1982).

An equally objectionable feature of the statute is that it would authorize a court to enjoin an antihunting protest in advance upon application of any person who "reasonably may be affected by such conduct" where that person can show "that such conduct is threatened" or that it has occurred in the past "and that it is not unreasonable to expect that under similar circumstances it will be repeated." 720 ILCS 125/4(a) (West 1996). This is a classic prior restraint (see *Alexander v. United States*, 509 U.S. 544, 550, 125 L. Ed. 2d 441, 450, 113 S. Ct. 2766, 2771 (1993)) and is presumptively invalid under cases such as *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 29 L. Ed. 2d 1, 5, 91 S. Ct. 1575, 1578 (1971).

social and political issues. For some, those issues are every bit as compelling as racial equality, gender discrimination, and abortion. Under the first amendment, we cannot circumscribe the debate on those questions any more than we can limit the debate on the rights of women and minorities or the state's role in regulating reproduction. As in all of those areas, opposition to the protestors' views may be strident, but

"' "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." ' *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55 (1988) (quoting *FCC v. Pacifica Foundation*, 438 U.S. 726, 745 (1978)). ' "If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." ' *United States v. Eichman*, 496 U.S. 310, 319 (1990) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989))." *Simon & Schuster*, 502 U.S. at 118, 116 L. Ed. 2d at 488, 112 S. Ct. at 509.

The state may worry that a hunter may be so antagonized by a protestor's complaints that he may attempt to do bodily harm to that person. Such concerns are purely speculative and reflect a distrust for recreational hunters I do not share. There is no reason to assume that just because a hunter is willing to take game he might also be willing to shoot another human being. Even if the state's concern had some demonstrable basis, however, our constitutional system requires that the efforts of the government be directed at protecting the protestor rather than silencing him, for "the duty of the police ordinarily must be to protect the speaker's right of expression—whatever the reaction." L. Tribe, American Constitutional Law 620 (1978).

In any event, concerns about violence during the course of a hunt cannot justify the expansiveness of the prohibition imposed by the Illinois statute. In contrast

to the version of the statute at issue in *Lilburn*, 265 Mont. at 266-67, 875 P.2d at 1041, the Illinois law does not limit its proscriptions to activities which occur in the field during an otherwise lawful hunt. It prohibits interference even when the hunter is merely traveling, camping, or engaged in "other acts preparatory to the taking" of an animal. 720 ILCS 125/1(b), 125/2 (West 1996). So broadly drafted is the statute that even a proponent of hunter harassment laws has acknowledged the Illinois version to be constitutionally infirm. See 72 U. Det. Mercy L. Rev. at 446 n.58.

For the foregoing reasons, I would affirm the judgment of the circuit court, but declare section 2 of the Illinois Hunter Interference Prohibition Act to be unconstitutional in its entirety. In addition, I would overrule the appellate court's opinion in *Woodstock Hunt Club v. Hindi* upholding the statute's constitutionality.

JUSTICE BILANDIC, dissenting:

I respectfully dissent. I would find that section 2(c) of the Act meets constitutional standards.

I agree with the decision and reasoning of our appellate court in *Woodstock Hunt Club v. Hindi*, 291 Ill. App. 3d 1051 (1997), which rejected overbreadth and vagueness challenges to the Hunter Interference Prohibition Act. That court correctly concluded that section 2(c) is not impermissibly content-based. Section 2(c) prohibits the disturbance of a hunter when that disturbance is intended to "dissuade or otherwise prevent" the taking of an animal. Although the disturbance may take the form of verbal expression, the commission of this offense is not dependent on the content of the expression. The *Woodstock Hunt Club* court aptly illustrated this distinction:

> "A person may violate the Act by shouting 'Fire!', by waving a placard proclaiming 'Hunting is good!' in front of a hunter, or by playing the 1812 Overture on a stereo

system, if any of these actions is done with the intent to dissuade or prevent the taking of a wild animal and disturbs either a hunter or his intended quarry." *Woodstock Hunt Club*, 291 Ill. App. 3d at 1054.

The majority reasons that the use of the term "dissuade" renders section 2(c) impermissibly content-based because that term connotes the conveyance of a message. Section 2(c), however, does not prevent antihunting advocates from attempting to convince hunters not to hunt. Rather, it merely prohibits *disturbing* a hunter who is engaged in the hunt if the intent of the disturbance is to dissuade or otherwise prevent the taking of the animal. It is the act of disturbing, not the act of dissuading, that is proscribed. The content of what is said to disturb the hunter is not relevant. As noted by the Montana Supreme Court in rejecting this precise argument, a person could wish to prevent the taking of an animal by a hunter for reasons other than opposition to hunting, such as a desire to shoot the animal himself. *State v. Lilburn*, 265 Mont. 258, 268, 875 P.2d 1036, 1042-43 (1994). Section 2(c) simply does not single out any particular thought or opinion for prohibition. It is therefore content-neutral.

I would further find that section 2(c) is neither unconstitutionally overbroad nor vague. The doctrine of overbreadth "is designed to protect first amendment freedom of expression from laws written so broadly that the fear of punishment might discourage people from taking advantage of the freedom." *People v. Bailey*, 167 Ill. 2d 210, 226 (1995). The doctrine is used sparingly; in order for a statute to be invalidated for overbreadth, its overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 37 L. Ed. 2d 830, 842, 93 S. Ct. 2908, 2918 (1973). Section 2(c) is not so broadly drafted that possible unconstitutional applications are real and substantial. The

conduct that is proscribed by section 2(c) is the intentional disturbance of a hunter engaged in a lawful activity. Both sides agree that the government has a legitimate interest in regulating the hunting environment and in protecting hunters against unwarranted intrusions during the hunt. Section 2(c) achieves the legitimate goals of protecting hunters from intentional interference and preventing potentially violent confrontations. See *Lilburn*, 265 Mont. at 268, 875 P.2d at 1042. The conduct proscribed by section 2(c) is reasonably drawn and is not protected by the constitution. Defendant has not shown that the statute is so broadly drawn that it prohibits constitutionally protected expression. As discussed above, section 2(c) does not prevent antihunting advocates from attempting to convince hunters to stop hunting. Rather, the statute merely prohibits them from intentionally interfering with hunters during a lawful hunt. Section 2(c) is not unconstitutionally overbroad.

Neither is section 2(c) unconstitutionally vague. A statute is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108, 33 L. Ed. 2d 222, 227, 92 S. Ct. 2294, 2298 (1972). Section 2(c) gives adequate warning of what activities it proscribes. Moreover, there is no question that defendant was given fair warning that his conduct fell within the proscriptions of section 2(c). Defendant is alleged to have approached a woman who was engaged in the lawful taking of a deer at a deer relocation center. Defendant asked the woman if she was a veterinarian, and when she responded in the affirmative, defendant began taking photographs and yelling at her. After informing the woman that he had also taken down her license plate number, defendant allegedly continued to threaten her by following her in his car. Defendant's alleged conduct was unquestionably proscribed by section 2(c).

For the foregoing reasons, I would reverse the trial court's judgment holding section 2(c) unconstitutional. I therefore dissent.